## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| GARO GARABEDIAN | |
| Plaintiff, | CIVIL ACTION NO: |
| v. | |
| CITY OF WATERBURY, | |
| Defendant. | MAY 3, 2022 |

## COMPLAINT

The Plaintiff, Garo Garabedian, by and through the undersigned counsel, alleges the following against Defendant the City of Waterbury (the "City"):

## PRELIMINARY STATEMENT

1.      Garabedian worked for the City as a Traffic Engineer from June 15, 2010 until November 13, 2021, when Waterbury informed him it was applying its "Compulsory Resignation" policy and terminating his employment. The City intentionally and willfully discriminated against him in the terms, conditions, and privileges of his employment by the City substantially because of his age, substantially because he is a person with a disability, and in retaliation for his taking medical leave just before his termination. The City routinely allows younger and non-disabled individuals to remain on medical leave for extended periods of time and does not enforce its three-day absence policy uniformly among City employees. Garabedian was terminated based on improper and unlawful considerations including his age, physical conditions, and use of authorized FMLA leave.

## PARTIES

2.      Garabedian is a resident of the State of Connecticut.

3.      The City is a municipality in the State of Connecticut.

4.      Throughout his tenure with the City, Garabedian worked in Connecticut.

## PROCEDURAL PREREQUISITES

5.      On May 5, 2021, Plaintiff filed a "dual charge" of discrimination against Defendant with the Connecticut Commission on Human Rights and Opportunities ("CHRO") and the United States Equal Employment Opportunity Commission ("EEOC").

6.      On January 28, 2022 the EEOC sent a Notice of Right to Sue letter regarding charge no. 523-2021-01357 to the Plaintiff.

7.      On January 28, 2022, the CHRO sent a Release of Jurisdiction over CHRO No. 2130540.

8.      Both the EEOC and CHRO notices were received by the Plaintiff and his counsel on or around February 4, 2022 due to errors in electronic delivery. The Plaintiff is further entitled to equitable tolling of his claims in this case for reasons including medical issues.

9.      Plaintiff exhausted all administrative remedies with respect to his claims concerning discrimination because of his age, and disability under both Federal and Connecticut law.

## JURISDICTION AND VENUE

10.     Garabedian's claims pursuant to the Age Discrimination in Employment Act ("ADEA"), the Americans with Disabilities Act 42 U.S.C. § 12101, *et seq*., ("ADA") and the Family Medical Leave Act, 29 U.S.C. § 2601 et. seq. ("FMLA") raise questions of federal law. This Court has jurisdiction over the Title VII, ADA, and FMLA claims pursuant to 28 U.S.C. § 1331. This Court has supplemental jurisdiction over Garabedian's remaining claims, including those under the Connecticut Fair Employment Practices Act § 46a-60, *et seq*., which arise from

the same case or controversy, pursuant to 28 U.S.C. § 1367(a).

11.     The District of Connecticut is the appropriate venue for this matter. Plaintiff resides in Connecticut, and the City is a municipality in the State of Connecticut. Further, Garabedian performed his work for the City while physically present in Connecticut.

## FACTUAL ALLEGATIONS

12.     Garabedian was well-qualified for the position he held as City Traffic Engineer for the City. He holds a Bachelor of Science degree in Engineering from the University of Rhode Island and a Master of Science degree in Traffic Engineering and Transportation Planning from the Polytechnic Institute of New York University ("NYU;" now known as New York University Tandon School of Engineering). Garabedian also completed significant coursework toward earning a Ph.D. in Traffic Engineering from NYU.

13.     Garabedian's work in the field of traffic engineering is extensive and varied and show solid credentials and demonstrated achievements in the field of municipal traffic engineering. His professional licenses and certifications are current. His experience includes:

      a.  From June 1973 to June 1974, Assistant Civil Engineer, New York City Department of Traffic;

      b.  June 1974 to December 1977, Director, Division of Traffic Engineering, Jersey City, New Jersey;

      c.  December 1977 to July 1980, City Traffic Engineer, Assistant Director of Public Works, Newport, Rhode Island; and

      d.  August 1980 to February 2009, Superintendent, Traffic Engineering Division and the Town Traffic Engineer Liaison with the Connecticut State Department of Transportation, Greenwich, Connecticut.

14.     In early 2012, Garabedian responded to a job posting in a professional publication for the position of City Traffic Engineer for the City of Waterbury. He started his employment with the City in April 2012, at which time he received a job description fort the position of City

Traffic Engineer, which was dated June 15, 2010 ("Job Description;" attached as Exhibit "B".)

15.     The Job Description set forth the requirements of his position: it fully and accurately described the work he was required to perform as City Traffic Engineer. The Job Description remained unchanged from April 2012 to January 9, 2021. The Job Description contained no physical requirements or standards whatsoever. This is not surprising because the position of City Traffic Engineer is a largely administrative job and does not involve physical labor.

16.     Throughout his tenure with the City, Garabedian performed his duties well. He was a competent and highly-regarded Traffic Engineer. Garabedian was primarily responsible for the development of policies and interventions to facilitate traffic safety, including direction and management of construction projects involving intersections, roadway re-alignment, and roundabout and mini-circle design and construction; as well as preparation and presentation of budgets, capital improvement programs, and federal and state grant applications. Garabedian was also responsible for the development and management of critical highway safety programs and for the initiation and management of the installation of solar powered pedestrian activated warning signals. During his employment as Traffic Engineer with the City, the Police Commission unanimously approved all reports and traffic recommendations he submitted to them.

17.     Garabedian's daily duties as City Traffic Engineer did not require any particular physical capabilities.

18.     On Tuesday, April 7, 2015, Garabedian sustained a "Cauda Equina" spinal cord injury without trauma due to a virus. Garabedian underwent emergency surgery and more than seven months of medical treatment and rehabilitation. Garabedian took FMLA leave for the first

three months of his recovery.

19.      Garabedian sustained significant disabilities as a result of the Cauda Equina injury. Garabedian was completely paralyzed from the waist down. Garabedian needed to learn how to walk again and initially had significant difficulties with walking, standing, and moving. Garabedian still walks with a cane and uses handicap ramps when available, and he is able to cautiously ascend and descend stairs with handrails. Garabedian continues to use a handicap bathroom and uses building elevators and handicap automatic doors when available. At times, Garabedian has difficulty standing or sitting for long time periods and walking long distances with a cane.

20.      The City approved Garabedian's request for an extended FMLA leave, and on October 15, 2015, Dr. David Rosenblum granted Garabedian medical clearance to return to work. Medical clearance notwithstanding, after seven months the City did not think Garabedian could perform his duties and terminated Garabedian's employment.

21.      As City Traffic Engineer, Garabedian was a member of Local 2090 of Council 4, American Federation of State, County, and Municipal Employees (the "Union"). The Union grieved his termination, and he was reinstated subject to an Agreement dated October 27, 2015 (the "2015 Agreement"). Pursuant to the 2015 Agreement, Garabedian was permitted to return to work on October 29, 2015, subject to several provisions including, without limitation: "Any unauthorized absences by Garo Garabedian will be grounds for immediate termination" and a requirement that Garabedian received a vision test before returning to work. Both of these provisions constitute discrimination and retaliation against Garabedian based on his physical disabilities and his age as well as FMLA retaliation.

22.      The City allowed and continues to allow younger employees and employees with

less significant physical disabilities to return to work from medical absences without having to agree to the same draconian terms imposed upon Garabedian by the 2015 Agreement. Garabedian was unfairly and illegally targeted for this treatment based on his age, physical disabilities, and status as recently having taken protected FMLA leave.

23.     The use of the 2015 Agreement in close temporal proximity to the leave requested reveals the strong retaliatory animus the City has against Garabedian for taking FMLA leave dating back to that period.

24.     After he was reinstated, Garabedian continued to perform his duties as City Traffic Engineer in an exemplary manner. Using technology such as Aerial Photos obtained from Geographic Information System of the City of Waterbury, and the use of Google Street View, Garabedian was able to perform his Traffic Engineering duties efficiently, albeit in a slightly different manner from how he performed his job prior to 2015. He requested and received technology upgrades that allowed him to perform the essential functions of the City Traffic Engineer job, so there was no disruption to the performance of his duties.

25.     Garabedian received satisfactory performance reviews for all annual performance evaluations, including those performed after 2015. Garabedian reported to the City Engineer and Board of Police Commissioners and always received positive feedback on his work. Garabedian had the support of both the City Engineer and the Board of Police Commissioners on his recommendations to improve traffic flow and safety. Indeed, the Board of Police Commissioners unanimously accepted and approved his recommendations and reviews of traffic issues and concerns for the City and Connecticut Department of Transportation, including maintenance, construction, and repair of facilities, roads, and bridges. His performance reviews continued to be positive and he was not disciplined or criticized for performance issues. He had physical

6

limitations, but nothing that prevented him from performing his job.

26.     Notwithstanding the efficacy of his reasonable accommodations, Garabedian began to receive discriminatory treatment by the City after October 2015. For example, he was the only Department of Public Works Bureau of Engineering employee ("DPW") relocated to the new DPW Complex on Huntingdon Avenue, after working more than five years from the DPW Administration location on Jefferson Square. At Jefferson Square, Garabedian had a single manager's office. He was forced to share office space with three laborers whom he supervised while at Huntingdon Avenue. Garabedian was the only Bureau Chief treated this way. This was a material change to the conditions of his employment and a further example of discriminatory treatment by the City based on his age, physical disability, and in retaliation for taking FMLA leave.

27.     During 2019-2020, Garabedian developed cataract issues and needed surgical intervention. Garabedian submitted a request for an FMLA leave to the City's Department of Human Resources ("HR") on July 21, 2020, and it was approved on July 29, 2020. Garabedian was granted FMLA leave for the period August 17, 2020 to October 18, 2020.

28.     Prior to taking FMLA leave Garabedian made sure that his duties would be handled properly in his absence. He prepared and submitted a Two Month Operation Plan noting his daily responsibilities, and emailed it to his supervisor, Director of Public Works Dave Simpson, on August 14, 2020. He also met with Director Simpson and Assistant Directors Mark Lombardo and Patrick Mulvehill on August 14, 2020, to discuss the Two Month Operation Plan Document. All three agreed it was adequate.

29.     On October 16, 2020, Garabedian requested an extension of his FMLA leave from October 18, 2020 to November 6, 2020. His twelve-week limit on FMLA leave would not have

been exhausted until November 12, 2020. Garabedian's request was approved by HR and his FMLA leave extended to November 6, 2020, with an expected return to work of Monday, November 9, 2020.

30.     On Friday, November 6, 2020, Garabedian was informed by his ophthalmologist, Dr. Kimberly Sippel, that she was rescinding his medical clearance to return to work on November 9, 2020. Dr. Sippel scheduled Garabedian for another procedure on Wednesday, November 11, 2020.

31.     Upon leaving Dr. Sippel's office on November 6, 2020, Garabedian called his supervisor, David Simpson, to advise him of the situation. Simpson instructed Garabedian to contact Michele Jameson, Human Resources Department, and inform her that Garabedian would not return to work on Monday, November 9, 2020. Simpson advised Garabedian to submit a note from his doctor as soon as possible.

32.     Garabedian was not aware, nor was he informed, that Waterbury had a three-day mandatory resignation policy. This policy states than any employee who is absent without authorization for three or more days will be considered to have resigned. This policy is not uniformly applied throughout the City. In Garabedian's case, it was used unfairly to discriminate against him based on his age, disability, and in retaliation for his FMLA leave request.

33.     On Saturday, November 7, 2020, Garabedian emailed Michele Jameson to advise her in writing of his situation and to request a further extension of his FMLA leave of absence. Garabedian copied Simpson and Director of HR Scott Morgan on the email. At this point, Garabedian had not exhausted his 12 weeks of FMLA leave, which was available to him through the week of November 12, 2020.

34.     On November 11, 2020, Scott Morgan sent him an email denying his request for

the further extension of his FMLA leave, stating that because Garabedian had been absent without authorization for three consecutive days, Garabedian is considered to have resigned under the compulsory resignation rule. Mr. Morgan did not mention that Garabedian's continued entitlement to FMLA leave would have extended to November 12, 2020. Further Mr. Morgan did not inform Mr. Garabedian that the City routinely grants accommodations in the form of extended medical leave as a matter of City policy.

35.     The fact that the City's HR Department calculated Garabedian's alleged period of "unauthorized absence" while Garabedian still had additional days until the week of November 12, 2020 during which Garabedian was eligible for FMLA leave, indicates an intent to willfully deny him the benefits of FMLA leave and to retaliate against him for taking FMLA leave and for requesting an extension of said FMLA leave.

36.     The fact that the City failed to consider his then current medical condition, his need for further surgery, or his request to consider the medical note from his physician which Garabedian had promised them in his November 7, 2020 email, indicates that they were intent on retaliating against Garabedian for taking FMLA leave and on discriminating against him based on his age and disability regardless of what the situation was or why Garabedian requested the additional leave.

37.     On November 12, 2020 Garabedian sent an email to Mr. Morgan requesting that he reconsider his decision and to await the receipt of the medical documentation Garabedian would provide. Mr. Morgan responded by sending a letter dated November 13, 2020 stating that the City was applying its Compulsory Resignation policy to terminate him.

38.     At that point on November 13, 2020, Garabedian was still eligible for FMLA leave. Further, the City refused to wait for his doctor's documentation or to consider his need for

extended leave beyond the FMLA period. Because the City's practice is to consider and to grant reasonable requests for leave beyond the FMLA period when needed for medical reasons, the fact that Garabedian was denied this fair consideration indicates the City's intent to retaliate against him for taking FMLA leave and to discriminate against him based on his age and his disability.

39.    One or more City employees were absent without authorized FMLA leave for medical reasons in recent years for more than three consecutive days and were not terminated. The City's Director of Safety and Security Mr. John Herman with the Board of Education was employed for more than one year with donated sick time after FMLA leave was exhausted. Other employees who were younger and not disabled were also permitted non-FMLA leave for extended periods of time.

40.    With help from his Union, Garabedian filed a grievance complaint protesting his termination as a violation of the collective bargaining agreement. The manner in which the City responded to this legitimate grievance further illustrates the City's intention to retaliate and discriminate against him by termination of his employment.

41.    The first grievance meeting was held on Friday, December 4, 2020. It was a telephone conference with the Union Attorney, Union President, and Waterbury Officials. That was Step I of the grievance process.

42.    When the grievance was denied at the first level the City scheduled a Step II grievance hearing for Wednesday, January 6, 2021 and Garabedian was initially advised it was to be a telephone conference. Garabedian was later advised, the day before the meeting, that it was to be an in-person hearing. This was discriminatory for several reasons. First, because Garabedian had no advance warning, Garabedian was unable to attend due to previously

scheduled and necessary medical appointments. The City refused to re-schedule the hearing

notwithstanding the medical necessity of his absence and his offer to participate by phone.

Changing the meeting to in-person at the last minute was a transparent tactic intended to

disadvantage him because of his medical conditions. It further reveals the City's discriminatory

attitude towards the Plaintiff.

43.    Plaintiff was then told by his Union President that the City was to reschedule the

hearing to Friday, January 8, 2021 but the Union Attorney was unavailable.

44.    The City ultimately held the hearing without Plaintiff's knowledge and without

the participation of Union representation and denied the Step II grievance for failure to attend the

hearing. This is further evidence of discrimination and retaliation against Garabedian.

45.    On January 12, 2021, mere days after the Step II grievance was denied because

Garabedian had to attend a medical appointment and his Union representation was scheduled

elsewhere, the City posted a Revised Job Description for the Plaintiff's position as City Traffic

Engineer dated January 9, 2021. ("Revised Job Description").

46.    The Revised Job Description includes a number of additional physical

requirements regarding vision, walking, lifting, standing, and sitting which were never present

prior to Garabedian's termination. Further these requirements would render him unable to do the

job if they were based on fact or any reasonable requirements of the position. The changes to the

original Job Description were clearly discriminatory in that they included requirements that are

unnecessary and not required for the job of City Traffic Engineer. The intent of that Revised Job

Description was to prevent the Plaintiff from applying for or obtaining the position again after

his termination. This further expresses the discriminatory intentions of the City towards

Garabedian based on his disability.

47.     Further, the requirements of the Revised Job Description have a larger impact on people with disabilities and older people who might have difficulty with some of the unnecessary and arbitrarily invented physical requirements listed in the Revised Job Description.

48.     Further, the fact that the Revised Job Description was drafted on January 9, 2021, only one day after Garabedian's failed Step ll grievance denial, shows that no research, due diligence, or scientific data were used to determine what the physical qualifications for the position of City Traffic Engineer actually are. The arbitrary selection of physical qualifications which Garabedian could not meet illustrates the specific discriminatory intent of the City.

49.     After years of loyal service the City has discriminated against the Plaintiff based on his age and physical disabilities and they have retaliated against him for taking FMLA leave and for attempting to extend that leave to the maximum period permitted by law. The result of this discrimination was Garabedian's termination on November 13, 2020.

50.     Because of the discrimination and retaliation of the City Garabedian has suffered loss of income, loss of benefits, severe emotional distress, and other damages and losses including damage to his professional reputation and standing.

**CAUSES OF ACTION**

**COUNT ONE: DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA.**

51.     Plaintiff repeats the allegations of Paragraphs 1 through 50, as if fully set forth herein.

52.     The Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the ADA in that he has several physical impairments that substantially limit one or more major life activities, he has a record of such impairments, and he was regarded as having such impairments by the City.

53.   The defendant is covered by the ADA and is subject to its mandates.

54.   At all relevant times the Plaintiff was qualified to perform the essential functions of his job as Traffic Engineer, with or without reasonable accommodation.

55.   The Plaintiff suffered adverse employment action because of his disability or perceived disability including termination, assignment of sub-standard office accommodations, and arbitrary denial of rights afforded other non-disabled employees of the City.

56.   Further, the Defendants violated the ADA in that it failed to grant a reasonable accommodation of a brief extended medical leave for a specific procedure in violation of City policies and regulations.

57.   The Defendant knew of the Plaintiff's disability, knew that he could perform the essential functions of his job with the reasonable accommodation of a brief extension of his medical leave and nonetheless refused to grant the accommodation in violation of the ADA. The Defendant also failed to engage in the interactive process in any way.

58.   Further, the City's facially neutral policy of automatically terminating City employees after only three days of absence has a disparate impact upon individuals who are disabled in that it does not allow for time to obtain and fairly consider medical documentation provided by said disabled employees.

59.   The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendant, by and through its employees, based on Plaintiff's actual and perceived disabilities.

60.   Defendant cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff.  Any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on the Plaintiff's actual or perceived disability.

61.     As a direct result of the Defendant's disparate treatment, failure to accommodate, and disparate impact based on the Plaintiff's actual and perceived disabilities, the Plaintiff suffered loss of wages, loss of benefits, loss of pension credit, loss of career opportunities, damage to his reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to his loss and damage.

**COUNT TWO: DISABILITY DISCRIMINATION IN VIOLATION OF THE CFEPA**

62.     Plaintiff repeats the allegations of Paragraphs 1 through 61, as if fully set forth herein.

63.     The Plaintiff is and was at all relevant times an individual who is disabled within the meaning of the CFEPA in that he has several physical impairments that substantially limit one or more major life activities, he has a record of such impairments, and he was regarded as having such impairments by the City.

64.     The Defendant is covered by the CFEPA and is subject to its mandates.

65.     At all relevant times the Plaintiff was qualified to perform the essential functions of his job as Traffic Engineer, with or without reasonable accommodation.

66.     The Plaintiff suffered adverse employment action because of his disability or perceived disability including termination, assignment of sub-standard office accommodations, and arbitrary denial of rights afforded other non-disabled employees of the City.

67.     Further, the Defendant violated the CFEPA in that it failed to grant a reasonable accommodation of a brief extended medical leave for a specific procedure in violation of City policies and regulations.

68.     The Defendant knew of the Plaintiff's disability, knew that he could perform the essential functions of his job with the reasonable accommodation of a brief extension of his

medical leave and nonetheless refused to grant the accommodation in violation of the CFEPA. The Defendant also failed to engage in the interactive process in any way.

69.     Further, the City's facially neutral policy of automatically terminating City employees after only three days of absence has a disparate impact upon individuals who are disabled in that it does not allow for time to obtain and fairly consider medical documentation provided by said disabled employees.

70.     The adverse employment actions taken against the Plaintiff as described herein above were substantially motivated by the discriminatory animus of the Defendant, by and through its employees, based on Plaintiff's actual and perceived disabilities.

71.     Defendant cannot provide a legitimate, non-discriminatory reason for these adverse actions taken against the Plaintiff.  Any excuse proffered by Defendant is not legitimate and is merely a pretext for discrimination based on the Plaintiff's actual or perceived disability.

72.     As a direct result of the Defendant's disparate treatment, failure to accommodate, and disparate impact based on the Plaintiff's actual and perceived disabilities, the Plaintiff suffered loss of wages in the form of back pay and front pay, loss of benefits, loss of pension credit, loss of career opportunities, damage to his reputation, loss of status, inability to locate suitable replacement employment, and emotional distress, all to his loss and damage.

**COUNT THREE: AGE DISCRIMINATION IN VIOATION OF THE ADEA**

73.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 72, as if fully set forth herein.

74.     The Plaintiff, age 75 on the date of his termination, was at all relevant times a highly qualified and competent employee of the Defendant, and a covered person pursuant to the Age Discrimination in Employment Act (ADEA).

75.     Plaintiff was subjected to a series of adverse employment actions as described herein above, including but not limited to unequal treatment on account of his age, denial of the rights and privileges of his position as Traffic Engineer and wrongful termination of his employment based on his age.

76.     The Defendant's stated reason for the termination of the Plaintiff is pretextual because it violates the Defendant's own policies and regulations. There is no legitimate non-discriminatory reason for the Plaintiff's termination.  The reason stated by the Defendant is false and pretextual to attempt to justify the age-based decision.

77.     The Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment as stated herein above on account of his age in that he was terminated without cause or notice in favor of a younger employee and in that he was treated differently than similarly situated younger employees.

78.     The Plaintiff's age was a contributing or motivating factor for all of the adverse employment actions alleged herein.

79.     At all relevant times, the Plaintiff was performing his duties competently, was highly qualified for his position, and was in compliance with the reasonable performance expectations of the Defendant.

80.     The adverse employment actions alleged herein occurred under circumstances giving rise to an inference of age discrimination.

81.     On information and belief, the Defendant exhibited a pattern and practice of age discrimination. The Defendant discriminated against older workers in favor of hiring, retaining, promoting and employing younger workers.

82.     As a direct result of the Defendant's disparate treatment based on his age, the

Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

### COUNT FOUR: AGE DISCRIMINATION IN VIOLATION OF THE CFEPA

83.    Plaintiff repeats and realleges the allegations of Paragraphs 1 through 82, as if fully set forth herein.

84.    The Plaintiff, age 75 on the date of his termination, was at all relevant times a highly qualified and competent employee of the Defendant, and a covered person pursuant to the Connecticut Fair Employment Practices Act (CFEPA).

85.    Plaintiff was subjected to a series of adverse employment actions as described herein above, including but not limited to unequal treatment on account of his age, denial of the rights and privileges of his position as Traffic Engineer and wrongful termination of his employment based on his age.

86.    The Defendant's stated reason for the termination of the Plaintiff is pretextual because it violates the Defendant's own policies and regulations. There is no legitimate non-discriminatory reason for the Plaintiff's termination.  The reason stated by the Defendant is false and pretextual to attempt to justify the age-based decision.

87.    The Plaintiff was denied equal treatment in the terms, conditions and privileges of his employment as stated herein above on account of his age in that he was terminated without cause or notice in favor of a younger employee and in that he was treated differently than similarly situated younger employees.

88.    The Plaintiff's age was the substantial cause of all of the adverse employment actions alleged herein.

89.     At all relevant times, the Plaintiff was performing his duties competently, was highly qualified for his position, and was in compliance with the reasonable performance expectations of the Defendant.

90.     The adverse employment actions alleged herein occurred under circumstances giving rise to an inference of age discrimination.

91.     On information and belief, the Defendant exhibited a pattern and practice of age discrimination. The Defendant discriminated against older workers in favor of hiring, retaining, promoting and employing younger workers.

92.     As a direct result of the Defendant's disparate treatment based on his age, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

### COUNT FIVE: RETALIATION FOR EXERCISING FMLA RIGHTS

93.     Plaintiff repeats and realleges the allegations of Paragraphs 1 through 92, as if fully set forth herein.

94.     As set forth above, the Defendant discriminated against the Plaintiff, disregarded its own policies and practices and unlawfully terminated him in retaliation for exercising his rights under the FMLA. 29 U.S.C. § 2615(a)(2).

95.     As set forth above the Plaintiff exercised his rights protected under the FMLA when he took FMLA leave from August 17, 2020 until November 9, 2020 for his own serious medical condition.

96.     The Plaintiff was highly competent and qualified for his position.

97.     The Plaintiff suffered termination which is an adverse employment action under

circumstances giving rise to an inference of retaliatory intent for use of his FMLA rights.

98.     As a direct result of the Defendant's retaliation for exercising FMLA rights, the Plaintiff suffered loss of wages, loss of benefits, loss of career opportunities, damage to his reputation, loss of status and inability to locate suitable replacement employment, all to his loss and damage.

## COUNT SIX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

99.     Plaintiff repeats the allegations of Paragraphs 1 through 98, as if fully set forth herein.

100.    The actions of the Defendant as set forth above, including the acts of discrimination and retaliation including without limitation the termination of his employment without cause constitute intentional infliction of emotional distress against the Plaintiff.

101.     In taking the actions against the Plaintiff as aforesaid, the City intended to inflict emotional distress or it knew or should have known that emotional distress was the likely result of its conduct.

102.    The conduct of the City in this case was extreme and outrageous and was the cause of the Plaintiff's distress.

103.    The emotional distress sustained by the plaintiff was severe.

104.    As a direct result of the Defendant's intentional actions, the Plaintiff suffered emotional distress including depression, anxiety, loss of sleep, mental anguish, and loss of life's enjoyments, all to his loss and damage.

## COUNT SEVEN: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

105.    Plaintiff repeats the allegations of Paragraphs 1 through 104, as if fully set forth herein.

106.     As set forth above, the Defendant's conduct created an unreasonable risk of causing the Plaintiff emotional distress and did in fact cause such distress.

107.     The Plaintiff's distress was foreseeable by the Defendant and the emotional distress was severe enough that it might result in illness or bodily harm to the Plaintiff.

108.     The Defendant's conduct as set forth above was the cause of the Plaintiff's distress. Said distress was caused by the Defendant in the course of its termination of the Plaintiff.

109.     The Defendant breached its duty of ordinary care in its misconduct towards the Plaintiff as aforesaid.

110.     As a direct result of the Defendant's negligent and careless actions, the Plaintiff suffered emotional distress including depression, anxiety, loss of sleep, mental anguish, and loss of life's enjoyments, all to his loss and damage.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests:

(a)  Compensatory Damages including front pay, back pay and emotional distress damages;

(b)  Punitive Damages;

(c)  Costs;

(d)  Prejudgment interest;

(e)  Attorneys' Fees; and

(f)  Such other and further relief in law or equity as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all questions of fact raised by his Complaint.

Respectfully submitted,

GARO GARABEDIAN

By:   /s/
    Christopher S. Avcollie (ct 29034)
    Carey & Associates, P.C.
    71 Old Post Road, Suite 1
    Southport, CT 06890
    (203) 255-4150 tel.
    (203) 255-0380 fax
    cavcollie@capclaw.com
    *His Attorneys*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 3, 2022, a copy of the foregoing was filed electronically.

Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic

filing system.

By: __/s/_____

Christopher S. Avcollie